**STATE of Tennessee, Appellee,**

v.

**Clessie Raymond BUTTREY, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

June 24, 1988.

Permission to Appeal Denied by Supreme Court Aug. 29, 1988.

at home. If the line was busy, he would immediately call her relatives and friends to see if she might be talking to one of them. On the other hand, if she did not answer, the defendant would call her parents as well as others to determine her whereabouts. The defendant carried a gun with him at all times.

On the morning of January 8, 1986, the victim told the defendant she was going shopping with her mother. Later, the victim and her mother went shopping at several locations, ate lunch together, and the victim attended a meeting at one of the malls before returning home. The defendant saw the victim and her mother together a short distance from their respective homes. The victim took her mother home and went immediately to her home, approximately five houses away.

The defendant called his wife's father that afternoon and wanted to know if he had talked to the victim's mother. The victim's father told the defendant he had talked to her, but, in reality, he had not in fact talked to her. The victim's father stated he often told the defendant untruths just to get him off the telephone.

When the defendant arrived at his home on the afternoon in question, he searched for a telephone number or address of a man his wife might be seeing. During the search he discovered what he thought were birth control pills. The defendant subsequently went to a pharmacy where he was told that the medication he found was an oral contraceptive. He also went to a business where his wife had briefly worked part-time to see if she was there. He apparently thought his wife was having an affair with the owner of the business.

The victim's son talked with the defendant during the afternoon in question; and he too told the defendant his mother had gone shopping with his grandmother. He asked the defendant to have his mother call him when she returned.

The victim was seen by a medical doctor on July 1, 1985. She told the doctor she was having a discharge, spotting, between periods. The doctor gave the victim sam-

David L. Raybin, Joe P. Binkley, Sr., Nashville, for appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Albert L. Partee, Asst. Atty. Gen., Thomas H. Shriver, Dist. Atty. Gen., Thomas B. Thurman, Asst. Dist. Atty. Gen., Nashville, for appellee.

OPINION

JONES, Judge.

The defendant, Clessie Raymond Buttrey, was convicted of murder second degree by a jury of his peers. The trial court sentenced the defendant to serve a term of fifteen (15) years in the Department of Correction for murder second degree. The trial court also sentenced the defendant to serve an additional five (5) years, consecutive to the principal sentence, because the defendant employed a firearm in the commission of the offense.

The defendant appealed as of right to this Court after the trial court denied his motion for a new trial.

The defendant has raised two issues for our review. He contends that the evidence contained in the record is insufficient, as a matter of law, to support his conviction for murder second degree; and the sentence imposed by the trial court is excessive.

## SUFFICIENCY OF THE EVIDENCE

The defendant argues that the State failed to prove the elements of murder second degree; and, accordingly, this Court should reduce the grade of the conviction to voluntary manslaughter. We disagree.

The defendant was portrayed as an insanely jealous and possessive person who was extremely suspicious of his wife. During the course of a day he would call his home numerous times to see if his wife was

ples of an oral contraceptive. She was again seen on July 21, 1985, and related she continued to have the discharge. On November 21, 1985, the doctor told the victim to start taking the birth control pills. The container found by the defendant indicated the victim had been taking the pills for approximately a month.

The defendant became enraged when he discovered the pills. He told the police that he had had a vasectomy approximately thirteen years ago, and there was no need for his wife to use birth control pills.

When the victim arrived home, the defendant told her to sit at the dining room table. He removed his pistol from his clothing, cocked the pistol, and placed it upon the table. He showed the victim the birth control pills he had found and demanded an explanation. The victim explained to the defendant that she had been spotting and the doctor prescribed the pills as a treatment for her condition. She told the defendant that he could call the doctor and verify her explanation. The defendant, who had been sitting at the table, arose, grabbed the pistol, and told the victim he would shoot her for lying to him. According to the defendant, the victim said "You're not going to shoot me" and the victim "put her hand up to push the gun away and it—fired and hit her in the neck." The defendant told the police he was two feet from the victim when the gun discharged; and the muzzle of the gun was approximately fifteen to eighteen inches from the victim when it discharged.

The defendant related to the police that he only wanted to scare the victim into telling him the truth. He had no intention of killing the victim. However, the defendant could not explain why he cocked the pistol, which made it easier to fire the weapon.

The physical facts do not support the defendant's version of the killing. A pathologist testified that the muzzle of the gun was from zero to three inches from the victim's body when the gun was fired. There was an abrasion collar and black powder around the wound. Stippling was also present.

There were fresh abrasions and scrapes found on the victim's chin. The pathologist testified that he had examined the weapon used to kill the victim; and the abrasions and scrapes were consistent with the shape of the weapon. He reasoned that these scrapes and abrasions were apparently caused by the recoil of the weapon after it was fired.

The safety mechanisms of the murder weapon were in working order. According to a firearms expert, constant pressure had to be applied to the trigger before it would fire. The weapon did not have what is commonly referred to as a "hair" or "feather" trigger.

When an accused challenges the sufficiency of the convicting evidence, this Court must review the record to determine if the evidence adduced at trial is sufficient "to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn.R.App.P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or direct and circumstantial evidence. *Farmer v. State,* 208 Tenn. 75, 343 S.W.2d 895, 897 (1961); *State v. Brown,* 551 S.W.2d 329, 331 (Tenn.1977).

In determining the sufficiency of the evidence, we do not reweigh or reevaluate the evidence. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). Nor may we substitute our inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State,* 199 Tenn. 298, 286 S.W.2d 856, 859 (1956); *Farmer v. State,* 574 S.W. 2d 49, 51 (Tenn.Crim.App.1978). To the contrary, we are required to afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Cabbage,* supra.

Questions concerning the credibility of witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence are resolved by the trier of fact, not this Court. *State v. Cabbage,* supra. In *State v. Grace,* 493 S.W.2d 474 (Tenn.1973), our Supreme Court said: "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of

the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d at 476.

■ A criminal offense may be established exclusively by circumstantial evidence. *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451 (1958); *Duchac v. State*, 505 S.W.2d 237 (Tenn.1973) cert. denied sub nom. *Robinson v. Tennessee*, 419 U.S. 877, 95 S.Ct. 141, 42 L.Ed.2d 117 (1974); *State v. Hailey*, 658 S.W.2d 547, 552 (Tenn.Crim.App.1983); *State v. Lequire*, 634 S.W.2d 608, 614 (Tenn.Crim.App.1981). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971). In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *State v. Crawford*, supra, 225 Tenn. at 484, 470 S.W.2d at 613.

Since a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, *State v. Grace*, supra, the defendant has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982). This Court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record, and any inferences which may be drawn from the facts, are insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. *State v. Tuggle*, supra.

■ There is sufficient evidence contained in the record from which a rational trier of fact can conclude that the defendant is guilty of second degree murder. Tenn.R.App.P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Tuggle*, supra.

The evidence contained in the record does not support the defendant's argument that he is guilty of voluntary manslaughter as opposed to murder second degree. The defendant's reliance upon *State v. Thornton*, 730 S.W.2d 309 (Tenn.1987) is misplaced. The facts in the case *sub judice* do not mirror the facts in *Thornton;* nor does the holding in *Thornton* support this contention.

In *State v. Thornton* the defendant found his wife and the victim engaged in sexual intercourse in the front bedroom of his home. The defendant, stating he did not intend to kill the victim, shot the victim in the hip. The victim was much larger than the defendant, and the defendant simply wanted to disable the victim. The victim died from an infection several days later. In the case *sub judice* the concept that the defendant's wife had been unfaithful was nothing more than a figment of his imagination. The victim had not been unfaithful to the defendant; and her explanation concerning the medication was truthful. The victim had not committed any act, or series of acts, which could be deemed to have adequately provoked the defendant.

This issue is without merit.

## DE NOVO REVIEW OF SENTENCE

When an accused challenges the length, range, or manner of the service of his sentence, it is the duty of this Court to conduct a *de novo* review of the sentence without a presumption of correctness. T.C.A. § 40–35–402(d). See *State v. Moss*, 727 S.W.2d 229 (Tenn.1986).

In conducting a *de novo* review of a sentence this Court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the pre-sentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the defendant in his own behalf, and (h) the defendant's potential or lack of potential for rehabilitation or treatment. T.C.A. §§ 40–35–103 and 210. See *State v. Smith*, 735 S.W.2d 859, 863 (Tenn.Crim.App.1987); *State v. Scott*, 735 S.W.2d 825, 829 (Tenn.Crim.App.1987); *State v. Rhoden*, 739 S.W.2d 6, 16 (Tenn.Crim.App.1987).

The defendant was fifty-one (51) years of age when he was sentenced. Prior to killing his wife he was employed by the Metro Fire Department and a wholesale florist. The defendant resigned from the Metro Fire Department with the rank of captain after eighteen years of service. The record reveals the defendant has a high school diploma and served two years in the United States Navy. He has four children from a previous marriage.

 The defendant should be sentenced to a Range I sentence as a standard offender. Whether an accused should be sentenced as an especially mitigated offender is a question which rests within the sound discretion of the court. T.C.A. § 40–35–108, which creates this sentencing classification, states that "[a] defendant *may* be sentenced as an especially mitigated offender if the criteria herein are met." [Emphasis added] The word "may", when used in a statute or rule, "usually indicates that the act to which it refers is discretionary, rather than mandatory, and will be so construed unless the context indicates a different meaning." *Halfacre v. State*, 112 Tenn. 609, 611, 79 S.W. 132, 133 (1904). See *Black v. State*, 154 Tenn. 88, 93, 290 S.W. 20, 21 (1927). If the Tennessee General Assembly had intended for sentencing within this classification to be mandatory, it would have used the word "shall" as it did when defining the persistent offender and especially aggravated offender sentencing classifications. See T.C.A. § 40–35–106(c); T.C.A. § 40–35–107(8). Furthermore, the defendant does not qualify for sentencing as an especially mitigated offender. The record does not reveal that there were "extreme mitigating factors in the commission of the offense." T.C.A. § 40–35–108(b)(3).

 The defendant argues that his sentences should have been set at ten (10) years, the statutory minimum for the offense of murder second degree rather than fifteen (15) years. He argues that there are numerous mitigating factors which are present in the case *sub judice.*

This Court has examined each of the mitigating factors advanced by the defendant, and finds that the record does not support these factors. While there is some question as to whether the defendant was remorseful and truly sorry for his conduct, this Court is willing to find that the defendant was in fact remorseful and truly sorry; and consider this as a mitigating factor. T.C.A. § 40–35–110(13). However, this factor is offset by the defendant's previous history of criminal behavior. T.C.A. § 40–35–111(1). The record reflects that he carried a dangerous weapon with the intent to go armed and he carried the weapon into establishments which serve alcoholic beverages on numerous occasions.

The sentence imposed by the trial court is appropriate, and we adopt the sentence. The sentence imposed is no greater than that deserved for the offense committed by the defendant, T.C.A. § 40–35–103(2); and it is the least severe measure necessary to achieve the purposes for which it was imposed. T.C.A. § 40–35–103(4).

Confinement in the case *sub judice* is necessary to avoid deprecating the seriousness of the offense. T.C.A. § 40–35–103(1)(B). When a human life is taken, the offense is extremely serious; and the sentence should be of sufficient length to punish the defendant as well as provide an effective deterrent to others likely to commit similar offenses. T.C.A. § 40–35–103(1)(B). The citizens of this State must understand and appreciate that the taking of a life without just cause or provocation will result in confinement for an appropriate length of time.

The additional sentence imposed for the employment of a firearm is established by statute; and there is no discretion in the length of the sentence. See T.C.A. § 39–6–1701(a).

This issue is without merit.

The judgment of the trial court is affirmed.

DUNCAN, P.J. and BYERS, J., concur.